IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) STEVEN ENTERPRISES, LLC;<br>(2) BSM HOLDINGS REINSURANCE, LTD.;<br>(3) ALL MOXIE HOLDINGS REINSURANCE LTD.;<br>(4) AIR CAP HOLDINGS REINSURANCE. LTD.;<br><br>and<br><br>(5) BRANDON STEVEN<br><br>     Plaintiffs,<br><br>vs.<br><br>(1) BOKF, N.A.<br><br>    Defendant | **Case No.**  25-cv-00553-SH<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

This action arises from Defendant BOKF, N.A.'s ("BOKF" or "Defendant") egregious failure to implement basic and required security measures.  That failure resulted in a criminal siphoning a $13,055,221.41 wire transfer—a fraud that BOKF not only failed to detect but also failed to disclose to one of its largest clients once it became aware of it.  Plaintiffs Brandon Steven, Steven Enterprises, LLC, BSM Holdings Reinsurance, Ltd., All Moxie Holdings Reinsurance, Ltd., and Air Cap Holdings Reinsurance, Ltd. ("Plaintiffs") entrusted Defendant to perform basic banking services, including wire transfers, with candor and using industry-standard security procedures. Instead, Defendant ignored clear red flags, failed to implement even minimal security safeguards, and repeatedly missed signs of fraud.  BOKF's reckless conduct left Mr. Steven's sensitive bank information—and the competitive, non-public information of his companies—

1

accessible to third parties, and ultimately led to theft of more than $13,055,221.41, which was intended to pay off a revolving line of credit with BOKF.

Worse, once on notice of the fraud, BOKF failed to immediately notify Plaintiffs or law enforcement—putting its head in the sand and undermining efforts to recover the stolen funds. When Mr. Steven learned of the theft, federal law enforcement was immediately notified, and although a small portion of the stolen funds was ultimately isolated, BOKF's delay has jeopardized the return of the remaining balance.

In the wake of this theft, Mr. Steven was forced to pay over an additional $13 million to timely satisfy the then-existing financial obligation to BOKF. As of the date of this filing, the BOKF line of credit has been paid. This action is not about the line of credit; this dispute centers on BOKF's woeful failures to comply with industry standards, which directly caused Plaintiffs' loss, and BOKF's additional failure to inform Plaintiffs of a Business Email Compromise ("BEC") fraud. Notably, BEC fraud is a well-documented and recurrent form of fraud that has affected financial institutions and their customers for decades. In 2016, the Financial Crimes Enforcement Network ("FinCEN") issued formal guidance warning financial institutions of the growing threat posed by email-based scheme used to misappropriate funds.[1] Similarly, in its 2024 Internet Crime Report, the Federal Bureau of Investigation ("FBI") reported that losses related to BEC were the second largest category of reported cybercrime, underscoring the persistent and significant threat posed by such schemes.[2] Financial institutions play a critical role in identifying and preventing BEC fraud. The persistence of BEC schemes underscores the necessity for banks like BOKF to

---

[1] *See* FinCEN, *Advisory to Financial Institutions on E-Mail Compromise Fraud Schemes*, FIN-2016-A003, at 4 (Sept. 6, 2016), https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2016-a003 (last visited Oct. 11, 2025).

[2] *See* FBI, *Internet Crime Report 2024*, Internet Crime Complaint Center, at 10 (2024), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf (last visited Oct. 11, 2025).

maintain vigilant and proactive defenses against these commonly known threats, especially for high-risk transfers.[3]

Indeed, Defendant's conduct was not a mere oversight—it was a profound betrayal of trust. BOKF's duties and obligations to Plaintiffs did not arise from the line of credit, or any other financial product offered by Defendant. Rather, BOKF's responsibilities were created by federal laws and regulations specifically created in order for banks to prevent unauthorized access to financial information. Here, BOKF, N.A., as a National Bank, is subject to primary regulatory oversight by the Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC"). Additionally, it is expected to adhere to applicable interagency guidelines issued by the Federal Financial Institutions Examination Council ("FFIEC") in terms of information security program requirements and industry standards. Defendant's conduct demonstrated a profound failure to follow even the most basic industry standards to protect against unauthorized access to bank information systems.

Plaintiffs bring this action to hold Defendant accountable for its wanton conduct, constructive fraud, breach of fiduciary duties, and negligence and to seek compensatory and punitive damages for the devastating financial and reputational harm caused by Defendant's egregious misconduct. Accordingly, Plaintiffs state the following:

## **PARTIES**

1.     Plaintiff Brandon Steven ("Mr. Steven") is an individual domiciled in Kansas.

---

[3] FFIEC, *Authentication and Access to Financial Services and Systems*, at 4–5 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025).

2.     Plaintiff Steven Enterprises, LLC ("Steven Enterprises") is a Kansas limited liability company with its principal place of business in Wichita, Sedgwick County, Kansas. Its members are Brandon Steven and Rodney Steven II, who are both domiciled in Kansas.

3.     Plaintiff BSM Holdings Reinsurance, Ltd. ("BSM") is a corporation formed under the laws of Turks and Caicos.

4.     Plaintiff All Moxie Holdings Reinsurance, Ltd. ("All Moxie") is a corporation formed under the laws of Turks and Caicos.

5.     Plaintiff Air Cap Holdings Reinsurance, Ltd. ("Air Cap") is a corporation formed under the laws of Turks and Caicos.

6.     Defendant Bank of Oklahoma, N.A. is a national banking association maintaining its principal place of business in the City of Tulsa, Tulsa County, Oklahoma.

## JURISDICTION AND VENUE

7.     Jurisdiction and venue are proper in this Court, pursuant to Title 28, United States Code, § 1391(b)(1), because Defendant is headquartered in the City of Tulsa, Tulsa County, Oklahoma.

8.     Jurisdiction and venue are also proper in this Court pursuant to Title 28, United States Code, § 1391(b)(2), because a substantial part of the facts giving rise to these claims occurred in the City of Tulsa, Tulsa County, Oklahoma and the actions in question occurred in the City of Tulsa, Tulsa County, Oklahoma.

9.     BOKF is subject to personal jurisdiction in this Court because it is headquartered in Tulsa, Oklahoma.

10.    The jurisdiction of this Court arises under Title 28, United States Code, § 1332, because the parties are diverse in their citizenship, and Plaintiffs' damages as a result of BOKF's conduct exceed $75,000.00.

**GENERAL ALLEGATIONS**

**Plaintiffs' Relationship with BOKF**

11.    Mr. Steven is a businessman who has developed a considerable portfolio of assets through his various business ventures.

12.    His company, Steven Enterprises, is a holding company for a diverse portfolio of businesses throughout Kansas and the United States.

13.    Through Steven Enterprises, Brandon Steven created, acquired, and managed these and other businesses, which collectively employ over 9,000 employees nationwide.

14.    In the course of handling these financial assets, Mr. Steven discovered that few banks have the capabilities of effectively tending to the financial needs of his substantial and varied business enterprises. He determined Steven Enterprises would be best served by a prominent, national bank.  A bank like BOKF. Or so he thought.

15.    Mr. Steven expected that he and his companies would receive exceptional and attentive service from BOKF.

16.    As such, Mr. Steven began moving his numerous accounts to BOKF.

17.    Plaintiffs are customers of BOKF, regularly relying on Defendant to provide banking services—including handling large wire transactions—in conjunction with their portfolio of businesses across Kansas and the United States.

18.    As of the date of this filing, numerous of Steven Enterprise's investment companies hold reinsurance accounts with BOKF.

19.    Plaintiffs' assets under BOKF management are worth approximately $50,000,000. Upon information and belief, Plaintiffs and their affiliates are one of BOKF's largest customers.

20.    Indeed, this was not the usual banking relationship.

21.    BOKF assigned Plaintiffs a private banker, Ms. Sydney Fehr ("Ms. Fehr").

    a.    Upon information and belief, Ms. Fehr is a Vice President and Private Wealth Banker at BOKF.

    b.    According to BOKF's website, BOKF's private wealth division promised a "one-on-one relationship with a private banker"—to ensure personalized attention and consistent service.[4]

    c.    Ms. Fehr's LinkedIn profile echoes this promise. She advertises herself as responsible for "initiatives for the platforms serving high-net-worth clients" and offering "customiz[ed] wealth management solutions" for BOKF's large accountholders.[5]

22.    As a result of these activities, BOKF, through Ms. Fehr, became intimately familiar with Plaintiffs' business initiatives, including, but not limited to parent-subsidiary relationships, the location of financial assets, ongoing and anticipated business ventures, target business acquisitions, and other competitive information not made available to the public.

23.    Upon information and belief, BOKF, through Ms. Fehr, utilized this competitive information when advising Plaintiffs about their business endeavors.

---

[4] *See Private Banking*, BOK Financial, https://www.bokfinancial.com/wealth/products-and-services/private-banking-and-wealth-management/private-banking (last visited Oct. 11, 2025).

[5] *See* Sydney Fehr, LinkedIn, https://www.linkedin.com/in/sydney-fehr-b487a5113 (last visited Oct. 11, 2025).

24.     By obtaining this competitive information and providing advice to Plaintiffs in light of such information, Defendant established a special relationship of trust with Plaintiffs.

a.     Plaintiffs placed a unique confidence in BOKF as it was one of the few banks that held itself as capable of managing Plaintiffs' assets.

b.     As a result of this unique confidence, Plaintiffs placed their assets, which are valued over $50 million, in BOKF's charge.

c.     With regard to Plaintiffs' competitive business information, BOKF had a duty to act primarily for the benefit of Plaintiffs.

d.     BOKF was aware that the beneficiaries of Plaintiffs' assets included, but was not limited to: Brandon Steven; Steven Enterprises, LLC; Air Cap Holdings Reinsurance Ltd.; BSM Holdings Reinsurance, Ltd.; and All Moxie Holdings Reinsurance, Ltd.

e.     Defendant accepted not only Plaintiffs' assets for management, but also the responsibility to act primarily for the benefit of Plaintiffs.

25.     While Plaintiffs' relationship with BOKF became more intimate and collaborative, BOKF's obligations to act at least in accord with industry standards remained constant.

26.     Plaintiffs expected BOKF to implement and apply basic, industry-standard security procedures to safeguard sensitive and critical banking information, detect suspicious activity, educate and train bank employees in fraud prevention, and provide timely warnings regarding any account or wire red flags or anomalies.

27.     Plaintiffs also expected BOKF to provide full and prompt notification of any account compromises—especially compromises that Plaintiffs had no way to detect without BOKF.

28.     However, these reasonable expectations were not met.

**BOKF extends $13 million credit line**

29.     In 2024, a Steven Enterprises subsidiary (the "SES"), sought a Non-Real Estate Line of Credit ("line of credit") from BOKF in the amount of $13,000,000.

30.     To obtain this line of credit, Mr. Steven worked extensively with Ms. Fehr.

    a.     For months, BOKF, via Ms. Fehr and others, conducted due diligence to determine Plaintiffs' creditworthiness for a BOKF line of credit.

    b.     As part of this process, Mr. Steven sent Ms. Fehr extensive information, including documents concerning Plaintiffs' financial statements, credit history, cash flow projections, transaction history and more.

31.     None of the information shared with Ms. Fehr was made available to the public.

32.     Upon information and belief, Ms. Fehr used this competitive, non-public information to advise Plaintiffs about the credit line sought.

33.     Upon information and belief, Ms. Fehr became aware of Plaintiffs' target business acquisition.

34.     Upon information and belief, Ms. Fehr became intimately familiar with intricacies of Plaintiffs' business with regard to the target business acquisition, including those of its affiliates and subsidiaries.

35.     The line of credit was extended to SES; SES signed the applicable agreement ("Underlying Agreement") with BOKF and the effective date was May 15, 2024.

    a.     Steven Enterprises was not a party to the Underlying Agreement; it had no rights or obligations connected to the Underlying Agreement.

    b.     BSM, All Moxie, and Air Cap were not parties to the Underlying Agreement, but each of these plaintiffs pledged their own collateral to secure the

line of credit. Aside from pledging the collateral as security for the line of credit, neither BSM, All Moxie, nor Air Cap had any rights or obligations connected to the Underlying Agreement.

c.      Mr. Steven was not a party to the Underlying Agreement in his individual capacity. While he guaranteed full payment of the line of credit, Mr. Steven did so in his individual capacity and through a separate agreement with BOKF entitled the Commercial Guarantee. Aside from Mr. Steven's obligation to make full payment when the line of credit became due, he had no rights or obligations connected to the Underlying Agreement.

36.     Payment for this line of credit was due on September 30, 2025, and Mr. Steven timely paid the balance.

### Criminal obtains Plaintiffs' non-public business information.

37.     In early June 2025, Mr. Steven and the Chief Financial Officer of BSM, Tim Bishop, were contacted by Ms. Fehr and her colleague, via email, inquiring whether SES would pay the line of credit, or alternatively, renew it for 12 months. The subject line of this communication was "Financials Needed," as reflected below. (Figure 1).

**From:** Fehr, Sydney <SFehr@bokf.com>
**Sent:** Wednesday, June 18, 2025 10:37 AM
**To:** Tim Bishop <tbishop@brandonstevenmotors.com>; Brandon Steven
<brandon@brandonstevenmotors.com>
**Cc:** Brotton, Joshua <Joshua.Brotton@bokf.com>
**Subject:** RE: Financials Needed

Thank you, Tim.

Would you like to move forward with renewing the line of credit for another 12 months?
As a reminder, this can be paid down and drawn up and used for any purpose.

Best,

**Sydney Fehr**
**Vice President, Private Banker**
sfehr@bokf.com
**T** 913.401.4844 **M** 913.579.5212
NMLS ID #2270167
**BOK Financial Private Wealth**
Send Secure email: https://securemail.bokf.com/encrypt

38.    But, at the time of this communication, Mr. Bishop's email had been compromised by a criminal.

39.    Subsequent conversations in this email chain demonstrated that Mr. Steven intended to pay off the credit line early—well before the due date.

40.    And, while these emails were exchanged with BOKF to facilitate this payment during the subsequent weeks, the criminal became aware that the entire $13,055,221.41 credit line would be paid in full.

41.    On June 27, 2025, Mr. Steven emailed the Ms. Fehr and one of her colleagues requesting the wire instructions and payment amount for the line of credit. (Figure 2).



42.     But twenty (20) minutes later, the criminal emailed Ms. Feher and her colleague

directly with the same request. (Figure 3).

a.      This email removed Plaintiff Steven from the email communication and replaced his email address with a spoofed email—brandonsteven**rn**otors.com (the "spoofed email")—as opposed to brandon@brandonstevenmotors.com.

b.      The criminal asked the private banker to send the wire instructions to everyone on the email, including the spoofed email.

c.      BOKF had no prior email history with this spoofed email.

d.      Upon information and belief, BOKF did not detect, investigate or otherwise attempt to verify the spoofed email address.

e.      Because the criminal requested the same information that Mr. Steven asked for twenty minutes earlier, a reasonable bank would have closely scrutinized the correspondence, including an examination as to whether the email in Figure 3 above displayed any common indications of a business email compromise.

f.      BOKF decided not to closely scrutinize this email address, a willful, reckless and wanton decision.

g.      Defendant had a regulatory obligation to ensure its employees received adequate training on fraud prevention tactics—particularly those involving business email compromise—during the exchange of sensitive communications, such as the transmission of wire instructions for a $13,055,221.41 transfer involving a high-risk transaction.  Bank employees function as the final line of defense beyond system controls, and their awareness of such threats is critical to maintaining the integrity of financial transactions.  This expectation is reflected in the FFIEC's 2021 guidance, *Authentication and Access to Financial Institution*

*Services and Systems*, which states "Users are educated on common email compromise tactics and techniques and offered ways to avoid or mitigate attacks."[6]

43.    Instead, BOKF willfully, recklessly and wantonly transmitted sensitive wire instructions to the criminal. (Figure 4).



44.    This transmission provided the criminal with instructions to access a BOKF information system which should have been secured from unauthorized access. (Figure 5).

---

[6] FFIEC, *Authentication and Access to Financial Services and Systems*, at 15–16 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025).



45. Once the criminal accessed the BOKF information system, an email address and password were the only requirements for the criminal to create routine access into the BOKF information system. (Figure 6).



46. This BOKF process of emailing wire transfer instructions did not (i) require verification of the recipient's identity, (ii) establish adequate layered security and authentication

controls such as multifactor authentication, (iii) IP or device-based access restrictions, (iv) validation of sender-recipient relationships, or (v) any other controls that would have prevented unauthorized access into the BOKF information system.

47.    Neither Mr. Steven, BSM, All Moxie, Air Cap nor Steven Enterprises possessed login credentials for BOKF.

48.    As a result, BOKF did not detect that its information system was being accessed by a criminal, and it failed to inform Plaintiffs that Mr. Steven was being impersonated by a criminal using the spoofed email address on this communication.

49.    Upon information and belief, the BOKF information system to which the criminal gained access contained Plaintiffs' competitive information, including but not limited to, bank account numbers, business assets, the value of various business assets, loan interest rates, and tax information.

50.    Upon information and belief, BOKF did not rely on any industry-standard security controls surrounding its portal, such as multi-factor authentication or equivalent techniques to protect its portal and prevent unauthorized access to highly sensitive banking and financial information.

51.    BOKF's decision not to utilize industry-standard security controls was a willful, wanton and reckless decision, especially in light of the relevant banking regulations and guidance, discussed below.

52.    If BOKF had utilized these controls, upon information and belief, the criminal would not have obtained access to the BOKF portal and, thus, would not have obtained the wire instructions.

53.     That is so because the criminal would have had to provide authenticating information—such as a code sent to a previously registered phone number on file with BOKF, or other authenticating information provided through out-of-band verification.

54.     Put differently, multi-factor authentication or equivalent techniques would have required the criminal to do more than simply create a username and password, or provide their own phone number or PIN, to access the portal and obtain the wire instructions.

55.     Once obtained from the BOKF information system, the criminal adulterated the wire instructions, creating counterfeit instructions that replaced the intended BOKF account with a Citibank account under the criminal's control, thereby setting up a scheme to redirect the funds that Plaintiffs intended to use to pay off the line of credit.

56.     On June 30, 2025, the criminal established contact directly with the assigned BOKF private banker for a second time.

    a.     Just as before, the criminal impersonated Mr. Steven.

    b.     Just as before, the criminal sought sensitive information—this time, the interest rate for the credit line. (Figure 7).



From: Brandon Steven <brandon@brandonstevenmotors.com>
Sent: Monday, June 30, 2025 2:14 PM
To: Brotton, Joshua <Joshua.Brotton@bokf.com>
Cc: Tim Bishop <tbishop@brandonstevenmotors.com>; Fehr, Sydney <SFehr@bokf.com>
Subject: Re: Financials Needed

[External Email] This email originated from outside of the compa

Please what is the interest rate on this loan?

    c.     Just as before, and upon information and belief, BOKF did not detect, investigate or otherwise attempt to verify the spoofed email address.

d.      And just as before, BOKF willfully, wantonly and recklessly provided information that should have been safeguarded from unauthorized criminal access.

57.    BOKF should have identified the criminal's email shown in Figure 7 above. The FDIC and the OCC both require banks to "configure email systems to detect and prevent common email attack vectors, such as spoofed or phishing emails containing malicious links or attachments."[7]

58.    The criminal's email in Figure 7 above should have prompted closer scrutiny from Ms. Fehr and her colleagues, including an examination as to whether the email above displayed any common indications of business email compromise.

59.    Figure 7 above displays at least four red flags commonly associated with business email compromise: (1) a new email thread, (2) no prior communications, (3) a spoofed domain impersonating Mr. Steven (i.e., the spoofed email address), and (4) a request for sensitive financial information related to a $13,055,221.41 wire transfer.

60.    Any one of these red flags (let alone all four) should have prompted further investigation by BOKF into the bona fides of the criminal's request.

61.    Upon information and belief, BOKF failed to implement (or follow) basic and industry standard controls to detect when third parties create fake domain names that are substantially similar to its customers', such as the spoofed email address.  BOKF's failure was willful, wanton and reckless.

62.    As a result, BOKF failed to inform Plaintiffs that Mr. Steven was being impersonated by a criminal using a spoofed email address to communicate directly with the bank.

---

[7] OCC, *Joint Statement on Heightened Cybersecurity Risk*, at 4 (Jan. 16, 2020), https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-5a.pdf (last visited Oct. 11, 2025).

63.    Emboldened by the additional sensitive information received from BOKF, the criminal created a fraudulent website for BOKF entitled bokf**f**.com (the "fraudulent website") on June 30, 2025.

64.    Upon information and belief, BOKF failed to implement adequate look-alike domain processes, and it did not detect, investigate or otherwise attempt to identify this fraudulent website. By failing to detect that the criminal registered the "@bokf**f**" domain—the type of spoofed domain of which BOKF should have been monitoring—BOKF failed to thwart the scheme to divert Plaintiffs' $13,055,221.41.

65.    After the criminal received the wire instructions from BOKF, they adulterated the document.

　　a.    First, the instructions listed "Citibank" as the beneficiary.

　　b.    The wire transfer instructions also listed the beneficiary bank address as: 3800 S Ocean Dr., Hollywood, FL 33019.

　　c.    The beneficiary on these fraudulent wire instructions was listed inconsistently as "BOK Financial," "Citibank," and "Credit Services – Loans."

　　d.    The fraudulent wire instructions also contained artifacts of obliterated text—stray markings remaining from the original beneficiary information that was deleted and overwritten with the fraudulent beneficiary information, as seen below. (Figure 8).


Beneficiary: Credit Services - Loans

66.     Ultimately, the nefarious activities of the criminal culminated in Plaintiff Steven initiating a fraudulent wire transfer of $13,055,221.41 from Steven Enterprises' bank account at a separate bank to the criminal's bank account at another banking institution.

67.     This transfer occurred on July 1, 2025.

68.     These funds are missing, unaccounted for and, upon information and belief, lost to the criminal.

> a.      This never would have happened if BOKF detected the spoofed email the criminal created for Mr. Steven—an account it received or sent email to at least two (2) times;

> b.      This would never have happened had BOKF deployed or utilized tools to detect email domains spoofing BOKF—such as the criminal's use of the "@bokff" domain;

> c.      This never would have happened if the BOKF used multifactor authentication when permitting access to otherwise secure bank information systems; and

> d.      This never would have happened if BOKF had otherwise prevented the disclosure of the interest rate of the credit line to the criminal.

69.     Upon information and belief, BOKF failed to implement and follow basic, industry-standard security and controls designed to detect and prevent fraud.

70.     After the wire was transmitted Mr. Steven believed the credit line had been paid in full.

71.     But at this time, the $13,055,221.41 wire had been deposited in the Citibank account displayed on the fraudulent wire instructions. And, upon information and belief, the criminal was preparing to abscond with those funds.

**<u>Defendant fails to promptly notify Plaintiffs of ongoing criminal activity.</u>**

72.     On July 11, 2025, Plaintiff Steven's BOKF private banker contacted him to ascertain whether the $13 million credit line would be paid. (Figure 9).



73.     Alarmed at this email—as the funds were transferred ten (10) days prior, Mr. Steven immediately provided a screenshot of the completed $13,055,221.41 Wire. (Figure 10).



74.    But, in reality, BOKF never received this wire.

75.    Rather than tell Mr. Steven that BOKF did not receive the Wire, his BOKF private banker merely innocuously asked Mr. Steven to provide the 22-digit Fed reference number for the Wire transfer. (Figure 11).



> **From:** Fehr, Sydney <SFehr@bokf.com>
> **Sent:** Friday, July 11, 2025 3:35 PM
> **To:** Brandon Steven <brandon@brandonstevenmotors.com>; Tim Bishop <tbishop@brandonstevenmotors.com>
> **Cc:** Brotton, Joshua <Joshua.Brotton@bokf.com>
> **Subject:** Re: Financials Needed
>
> Can you please provide the 22-digit Fed reference number for the wire?

76.    Nothing in this response at all indicated to Mr. Steven there was any problem with the Wire, let alone that it had been intercepted by a criminal.

77.    Under the OCC's Bulletin 2019-37, *Operational Risk: Fraud Risk Management Principles*, banks must have effective systems to appropriately respond to fraud, suspected fraud, or allegations of fraud.[8]

78.    Any reasonable banking official, upon receiving Mr. Steven's screenshot, would have immediately: (1) advised it did not receive the Wire; (2) performed a basic investigation—including concerning their communications with the "@brandonsteven**rn**otors.com" domain; and (3) discovered that the Wire was diverted by the criminal who communicated with BOKF using the spoofed email domain.

79.    Yet BOKF's response did nothing to suggest to Mr. Steven that BOKF had failed to receive the wire. And it strains credulity that BOKF could have believed the wire was still being processed, as it was initiated 10 days earlier.

---

[8]    OCC, *Operational Risk: Fraud Risk Management Principles*, OCC Bulletin 2019–37 (July 24, 2019), https://www.occ.gov/news-issuances/bulletins/2019/bulletin-2019-37.html (last visited Oct. 11, 2025).

80.    Mr. Steven relied on BOKF's silence concerning the criminal while BOKF sat on its hands for days, jeopardizing any opportunity for additional funds to be returned to Plaintiffs. Yet BOKF knew it was a Fedwire transfer and that each transfer is final and irrevocable when made because Fedwire is a real-time settlement system, which requires an immediate sense of urgency for BOKF to notify parties and contact the receiving bank to report suspected fraud.

81.    On July 14, 2025, Plaintiff Steven and his private banker spoke on the telephone and BOKF finally forwarded Mr. Steven the communications between BOKF and the criminal—communications any reasonable banking official would have been aware of three days earlier.

82.    At this time, Mr. Steven was notified that BOKF did not receive the $13,055,221.41 Wire.

        a.    For the first time, BOKF sent correct wire instructions directly to Mr. Steven.

        b.    For the first time, Mr. Steven was able to compare the correct wire instructions to the fraudulent wire instructions.

        c.    And for the first time, Mr. Steven was informed that the wire instructions he received for the payment were manipulated by the criminal.

83.    Despite knowledge of the criminal's fraud, BOKF did not inform Mr. Steven or any other Plaintiff that BOKF communicated directly with (and failed to detect) the criminal at the spoofed email address in the days preceding the July 1 wire transfer.

        a.    At no point during the July 14 telephone call did Ms. Fehr inform Mr. Steven that BOKF had disclosed sensitive information about Plaintiffs' financial information to the criminal, including the legitimate wire instructions.

b.    BOKF did not inform Mr. Steven or anyone else associated with Steven Enterprises that the criminal had registered the "@bokff" domain to impersonate the assigned BOKF private banker.

84.    Despite clear red flags – including exchanging emails with the spoofed email address in providing wire instructions and other sensitive loan information—BOKF failed to implement or follow industry-standard security protocols and did not timely notify Plaintiff once it had constructive notice of the fraud.

85.    Since discovering the fraud, federal law enforcement officials have initiated an investigation in an effort to recover the diverted wire.  This investigation has led Citibank to freeze or otherwise isolate from use approximately $1.6 million from the Wire that remains in its possession.

86.    Plaintiffs could have engaged law enforcement earlier—increasing the possibility of recovering the full $13,055,221.41—if BOKF detected the spoofed email earlier.

87.    Plaintiffs could have engaged law enforcement earlier—increasing the possibility of recovering the full $13 million—if, on July 11, 2025, BOKF advised Plaintiffs that $13,055,221.41 was not received.

88.    Faced with BOKF's failure to recognize its culpability and failures—including a demand that Mr. Steven initiate a second wire to pay off the credit line, on or about September 30, 2025, Mr. Steven initiated the payment of over $13,000,000 to timely pay off the credit line, including accrued interest.  He wired these funds using assets held by BSM, All Moxie, and Air Cap.

89.     Simply put, the $13,055,221.41 theft was the vehicle through which Plaintiffs discovered BOKF's failure to comply with federal regulations requiring banks to protect financial information from unauthorized access.

## BOKF Repeatedly Failed to Follow Basic, Industry-Standard Security and Controls that Could Have Thwarted the Criminal's Scheme

### *BOKF's Failure to Create and Maintain a Comprehensive Information Security Program*

90.     For individual consumers, such as Mr. Steven, BOKF's duties to protect customer information pursuant to the OCC are expressly detailed in 12 C.F.R. Part 30—aptly entitled "Safety and Soundness Standards." Pursuant to Appendix B to Part 30, BOKF was required to maintain "a comprehensive written information security program that includes administrative, technical, and physical safeguards."

91.     To that end, in designing its information security program BOKF was required to consider whether "[e]ncryption of electronic customer information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access" was an appropriate security measure it must take. 12 C.F.R. Appendix B to Part 30, Part III, C(1)(c).

92.     BOKF was also obligated to fulfill the same duties with regard to corporate accounts. Section 39 of the Federal Deposit Insurance Act required the FDIC "to establish safety and soundness standards[,]" and these regulations appear in 12 C.F.R. Part 364—entitled "Standards For Safety and Soundness." The guidelines contained in Appendix B to Part 364 "address standards for developing and implementing administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information." Notably, this regulation defines customer to mean "a consumer who has a customer relationship[,]" and the term consumer includes "an individual who provides nonpublic personal information … in

connection with obtaining or seeking to obtain financial, investment, or economic services…regardless of whether…a continuing advisory relationship" is established. *See* 12 C.F.R. § 332.3(h) and 12 C.F.R. § 332.3(e)(iii). These FDIC regulations continue to require banks to "implement a comprehensive written information security program that includes administrative, technical, and physical safeguards appropriate to the size and complexity of the institution and the nature and scope of its activities." 12 C.F.R. Appendix B to Part 364, Part II, A.

93.    This program required by the FDIC must be designed to "[e]nsure the security and confidentiality of customer information;" "[p]rotect against any anticipated threats or hazards to the security or integrity of such information;" and "[p]rotect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer." 12 C.F.R. Appendix B to Part 364, Part II, B. BOKF was required to implement enterprise-wide safeguards designed to protect against anticipated threats that could result in unauthorized access or use of sensitive bank information.

94.    At a minimum, BOKF had to implement a security program that detects and fetters the telltale signs of business email compromise, such as criminal's registration of: (1) spoofed domains substantial similar to its customers (i.e., the spoofed email domain); and (2) spoofed domains substantial similar to its own domain (i.e., the "@bokff" domain).

95.    Upon information and belief, BOKF did not implement such a program or its existing controls are insufficient to meet regulatory requirements.

96.    Defendant never detected the spoofed email address.

97.    Defendant neither monitored the internet for fraudulent websites with names similar to BOKF.

98.    Defendant never detected the fraudulent "bokff" website created by the criminal.

99.    BOKF's conduct suggests it was completely indifferent to how these failures could (and did) impact Plaintiff and its businesses.

**BOKF's Failure to Implement Multi-Factor Authentication**

100.    According to federal regulatory guidance, including the FFIEC and the Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") Manual[9], wire transfers involving unusually large sums based on customer transaction history, first-time beneficiary accounts, and sensitive instructions are classified as "high-risk" transactions.

101.    The wire instructions in this case fit this "high-risk" definition.[10]

102.    FFIEC guidance demands that communications surrounding high-risk transactions—such as the transmission of wire instructions and the July 1 wire transfer—be protected by multi-factor authentication ("MFA") and layered security controls.[11]

103.    BOKF failed to employ these controls.

104.    Upon information and belief, the wanton, reckless, and willful decisions not to employ these controls were made at BOKF headquarters in Tulsa, Oklahoma.

---

[9]  FFIEC, *Authentication and Access to Financial Services and Systems*, at 4–5 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025); *see* FFIEC, *Risks Associated with Money Laundering and Terrorist Financing*, FFIEC BSA/AML Examination Manual (Oct. 2020), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/07 (last visited Oct. 11, 2025); FFIEC, *Assessing Compliance with BSA Regulatory Requirements*, FFIEC BSA/AML Examination Manual (Feb. 2021), https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/02 (last visited Oct. 11, 2025); FDIC, *Wire Transfers – Core Analysis, Risk Management Manual of Examination Policies* (Apr. 30, 2024), https://www.fdic.gov/risk-management-manual-examination-policies/sc-wires.pdf (last visited Oct. 11, 2025).

[10]  FFIEC, *Authentication and Access to Financial Services and Systems*, at 4–5 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025); *see* FDIC, *Bank Secrecy Act, Anti-Money Laundering, and Office of Foreign Assets Control*, at 8.1-27-29, https://www.fdic.gov/risk-management-manual-examination-policies/section-8-1.pdf (last visited Oct. 11, 2025).

[11]  FFIEC, *Authentication and Access to Financial Services and Systems*, at 6–8 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025).

105.    Upon receiving the link to BOKF's purportedly secure portal from BOKF on June 27, 2025, the criminal was able to make an account and access the legitimate wire instructions.

106.    Had BOKF employed MFA (or an equivalent), the criminal scheme may have been foiled, as it would have required identity verification through a second "factor" on file with BOKF (such as a code sent to a registered phone number or out-of-band confirmation).

107.    While BOKF purported to "secure" and "encrypt" the wire instructions—using "Proofpoint Encryption" (a popular cybersecurity vendor), such encryption was effectively useless without BOKF deploying MFA as an authentication requirement before the criminal created an account to access BOKF's portal.

108.    BOKF's failure to employ MFA or equivalent layered security checks with respect to its portal is a gross deviation from the security it should have employed, as it violated relevant FFEIC guidance and, thus, exposed Plaintiff to financial fraud via business email compromise—one of the most common types of financial fraud.

### BOKF's Failure to Detect Domain Spoofing & Fraudulent Emails

109.    In 2004, FDIC first issued guidance that establishes the clear expectation that financial institutions establish a process to monitor and report fraudulent domain names.[12]

110.    This includes the expectation that financial institutions "monitor[] for fraudulent Web sites using variations of the financial institution's name."[13]

111.    Fraudulent domain names often include "lookalike" domain names, such as the "@bokff" domain the criminal used to impersonate Mr. Steven's assigned private banker.

---

[12] FDIC, *Guidance on Safeguarding Customers Against E-Mail and Internt-Related Fraudulent Schemes*, FIL-27-2004 (2004), https://www.fdic.gov/news/financial-institution-letters/2004/fil2704a.html#:~:text=Incorporating%20notification%20procedures%20to%20alert,related%20fraudulent%20schemes%20are%20suspected (last visited Oct. 11, 2025).

[13] *Id.*

112.    BOKF utilized Proofpoint—a cybersecurity vendor—to attempt to encrypt messages containing sensitive banking and financial information, such as the legitimate wire instructions.

113.    According to its website, Proofpoint's capabilities also include real-time detection and proactive takedown of lookalike and malicious domains.[14]

114.    Other cybersecurity vendors offer similar services.

115.    Upon information and belief, BOKF decided not to employ (or properly utilize) tools sufficient to detect and facilitate the removal of domains attempting to mimic BOKF.com. This decision was reckless, wanton, and willful.

116.    Proofpoint—a vendor it already employed—could have provided BOKF the tools to detect and remove fraudulent websites with names similar to BOKF.

117.    BOKF's failure to employ or utilize these tools left its customers, such as Plaintiffs, exposed to significant risk from business email compromise—one of the most common types of financial fraud.

118.    Under the FFIEC guidance, banks engaged in high-risk transactions must implement appropriate layered security controls—including email authentication and internet domain monitoring such as Domain-based Message Authentication Reporting and Conformance ("DMARC")—to mitigate the risk of spoofing and unauthorized access to sensitive customer information.[15]

---

[14] *Email Fraud Defense*, Proofpoint, https://www.proofpoint.com/us/products/email-protection/email-fraud-defense (last visited October 11, 2025) ("If a lookalike domain attempts to impersonate your brand, we'll find it.").

[15] FFIEC, *Authentication and Access to Financial Services and Systems*, at 15–16 (Aug. 11, 2021), https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf (last visited Oct. 11, 2025).

119.    A DMARC policy is a record in a domain's Domain Name System ("DNS") that directs receiving email services how to handle emails from that domain that fail Sender Policy Framework ("SPF") and DomainKeys Identified Mail ("DKIM") authentication checks.

120.    A DMARC policy instructs servers on whether to accept, quarantine, or reject messages, thus acting as a critical tool against email spoofing and business email compromise.

121.    Upon information and belief, BOKF did not employ (or properly utilize) an effective DMARC policy consistent with FFIEC guidance. This too, was a willful, reckless, and wanton decision by BOKF.

122.    Had BOKF employed (or properly utilized) an effective DMARC policy, the spoofed email messages that Ms. Fehr and Mr. Brotton failed to detect would have been blocked or quarantined by the DMARC policy.

123.    Had this happened, the criminal's scheme could have been thwarted because the criminal would not have obtained the wire instructions.

## COUNT I – WANTON CONDUCT
### (Pursuant to Kansas Law)

124.    Plaintiffs incorporate by reference as though fully set forth herein the previous paragraphs of its complaint.

125.    As a trusted financial institution, Defendant was uniquely positioned to protect Plaintiffs' interests, possessing superior knowledge of banking risks, security protocols, and industry threats.

126.    Defendant owed Plaintiffs a duty to exercise at least slight care and diligence in handling the high-risk, high-value July 1, 2025 wire transfer and related sensitive information, especially given their longstanding relationship with Plaintiffs.

127.    In compliance with federal banking statutes and regulations, BOKF was required to safeguard financial information by, among other things, implementing a comprehensive information security program that includes administrative, technical, and physical safeguards to ensure the security and integrity of customer information. This program must be designed to protect against anticipated threats or hazards to information security as well as unauthorized access and use of such information that could result in injury to customers.

128.    FDIC guidance also dictated that Defendant monitor the internet for fraudulent websites using variations of BOKF's name.

129.    The FFIEC recognizes that use of single-factor authentication methods are inadequate against threats of unauthorized access resulting in data theft, customer account fraud, and identity theft. Accordingly, implementation of multi-factor authentication has become an industry standard for financial institutions.

130.    Defendant BOKF willfully, recklessly and wantonly decided not to comply with clear federal regulations, including but not limited to the implementation of a comprehensive information security program to ensure the security and confidentiality of customer information, protect against anticipated threats and hazards to the security and integrity of such information, and protect against unauthorized access and use of Plaintiffs' competitive, non-public information.

131.    Defendant BOKF willfully, recklessly and wantonly decided not implement multi-factor authentication as is standard in the banking industry.

132.    Defendant BOKF willfully, recklessly and wantonly decided not to monitor the internet to identify fraudulent websites using variations of Defendant's name.

133.    Defendant BOKF willfully, recklessly and wantonly ignored Plaintiffs' imminent risk of losing $13,055,221.41 when BOKF: (1) failed to implement the comprehensive information

security program required by federal law, (2) failed to implement multi-factor authentication when providing access to customer information, (3) repeatedly failed to detect the fraudulent "bokff" website, (4) repeatedly communicated with the spoofed email address, transmitting customer information to this email address on multiple occasions, and (5) provided a criminal with unauthorized access to BOKF's information systems.

134.    Defendant BOKF realized and understood that its failure to comply with these federal guidelines, regulations, and industry standards created a risk of injury to Plaintiffs.

135.    BOKF was aware that Plaintiffs suffered imminent risk of losing $13,055,221.41 when, during email correspondence, a criminal actor substituted Mr. Steven's actual email address with a spoofed email address that contained indicia of fraud, as set forth above.

136.    Defendant BOKF's failure to alert Plaintiffs of any of those indicia of fraud constitutes a reckless disregard of the risk that over $13,055,221.41 could be stolen in the event his financial information was not appropriately safeguarded.

137.    Defendant BOKF realized that Mr. Steven suffered imminent risk of losing $13,055,221.41 when BOKF: (1) communicated with the spoofed email address; (2) repeatedly failed to identify the "@bokff" email domain was created; and (3) failed to employ multi-factor authentication to protect unauthorized access to wire instructions on its purportedly secure portal.

138.    BOKF was aware that Plaintiffs suffered imminent risk of losing $13,055,221.41 when Defendant transmitted the wire instructions to the spoofed email address despite multiple indicia of fraud, as set forth above.

139.    Defendant BOKF willfully, recklessly and wantonly ignored Plaintiffs' imminent risk of losing $13,055,221.41 when granting a criminal access to the wire instructions and to a portal containing Plaintiff's non-public information, as set forth above.

140.    Defendant BOKF was in fact aware of Plaintiffs' imminent loss of $13,055,221.41 on July 11, 2025—once Mr. Steven asked Ms. Fehr to confirm receipt of the July 1, 2025 wire.

141.    Defendant BOKF's failure to immediately notify Plaintiffs that the July 1, 2025 wire was not received showcases a reckless disregard and indifference to Plaintiff's imminent risk of losing $13,055,221.41.

142.    Defendants' conduct demonstrated wantonness, callous indifference, and recklessness as evidenced by their disregard for obvious red flags and failure to act on known risks.

143.    As a direct and proximate result, Plaintiffs suffered damages, including the loss of $13,055,221.41 as well as consequential damages.

## COUNT II – BREACH OF FIDUCIARY DUTY
### (Pursuant to Kansas Law)

144.    Plaintiffs incorporate by reference as though fully set forth herein the previous paragraphs of its petition.

145.    BOKF had a fiduciary relationship with Plaintiffs because

a.    the bank enticed Mr. Steven to move his accounts to BOKF based on a promise of exceptional service;

b.    the bank assigned a private banker to become familiar with the Plaintiffs' business initiatives (including but not limited to parent-subsidiary relationships, the location of financial assets, ongoing and anticipated business ventures, target business acquisitions and other competitive information not made available to the public), and to advise Plaintiffs regarding the impact of business initiatives on assets under BOKF management;

c.    BOKF's assigned private banker was directly involved in efforts to (1) obtain a line of credit and (2) pay off the line of credit early; and

    d.    Mr. Steven requested the wire instructions, which BOKF ultimately transmitted to the criminal that stole $13,055,221.41.

146.    BOKF had a duty to implement appropriate safeguards to protect Plaintiffs' competitive information from unauthorized access.

147.    BOKF breached its duties to Plaintiffs by:

    a.    complying with a criminal's request that wire instructions be sent to a spoofed email, providing access to Plaintiffs' financial information without authorization;

    b.    complying with the criminal's request for the loan interest rate, disclosing sensitive financial information to a third party without authorization; and

    c.    permitting a criminal to access Plaintiffs' sensitive financial information through a secured portal at BOKF that did not utilize multifactor authentication.

148.    On July 11, 2025, Plaintiffs believed that BOKF had received the July 1, 2025 wire.

149.    Defendant was aware that it had not received any wire transfer to pay off the line of credit on July 11, 2025 because BOKF was in possession of an email from Mr. Steven and the wire transfer confirmation, which $13,055,221.41 was transferred to make the payment. In light of this information, BOKF had reason to believe that a criminal acquired the $13,055,221.41 transfer intended for BOKF.

150.    BOKF had information superior to Plaintiffs' on July 11, 2025, as it was aware it did not receive the July 1, 2025 wire.

151.    BOKF had a duty to disclose and not to conceal these facts from Plaintiffs as soon as it became aware it did not receive the July 1, 2025 wire.

152.    But neither Ms. Fehr nor anyone else associated with BOKF informed Mr. Steven—or any other Plaintiff on July 11, 2025—that it failed to receive the July 1, 2025 wire.

153.    BOKF did not tell Mr. Steven—or any other Plaintiff—about the criminal fraud that occurred.

154.    Defendant BOKF's omissions were material and created a false impression that BOKF received the July 1, 2025 wire.

155.    Plaintiff reasonably relied on Defendant BOKF's omissions, which delayed notification of the authorities about the criminal's fraud, and contributed to the inability to freeze the wire and recoup the funds.

156.    BOKF was the only entity in a position to verify the malfeasance of the criminal and do something about it on July 11, 2025.

157.    What is worse, BOKF was in a position to benefit financially from the criminal theft because a delay in payment would allow the accrual of additional interest and fees associated with the line of credit.

158.    Even worse, BOKF declined to report the occurrence of any malfeasance, chose not to notify Plaintiffs of the situation, and refrained from notifying law enforcement of the crime that took place. These decisions were willful, reckless, and wanton.

159.    And worst of all, the day after Brandon Steven timely paid the principle balance of the credit line on September 30, 2025, BOKF attempted to further extort Plaintiffs by seeking an additional payment of approximately $850,000 in interest and late fees.

160.    As a direct and proximate result of BOKF's omissions, Plaintiffs suffered damages, including the loss of $13,055,221.41.

## COUNT III – CONSTRUCTIVE FRAUD

### (Pursuant to Kansas Law)

161.    Plaintiffs incorporate by reference as though fully set forth herein the previous paragraphs of its petition.

162.    As of July 11, 2025, Defendant BOKF was aware that it did not receive the July 1, 2025 wire.

163.    BOKF was aware of this because Mr. Steven sent Ms. Fehr an email containing a screenshot of the July 1, 2025 wire, in which Mr. Steven asked Ms. Fehr to confirm receipt of the wire.

164.    Plaintiffs believed on July 11, 2025, that BOKF had received the July 1, 2025 wire.

165.    BOKF had superior information on July 11, 2025 as it was aware it did not receive the July 1, 2025 wire.

166.    Neither Ms. Fehr nor anyone else associated with BOKF informed Plaintiffs that the July 1, 2025 wire was not received by Defendant.

167.    BOKF had a duty to disclose and not to conceal these facts from Plaintiffs as soon as it became aware it did not receive the July 1, 2025 wire.

168.    Yet BOKF did not tell Mr. Steven or any other Plaintiff about the criminal fraud it discovered on July 11, 2025. This omission occurred with reckless disregard for the truth, as an immediate investigation into this topic would have revealed BOKF's multiple communications with the spoofed email, and multiple indicia of fraud as described above.

169.    Defendant BOKF's omissions were material and created a false impression that BOKF received the July 1, 2025 wire.

170. Plaintiffs reasonably relied on Defendant BOKF's omissions, which delayed notification of the authorities about the criminal's fraud and contributed to the inability to freeze the wire and recoup the funds.

171. As a direct and proximate result of BOKF's omissions, Plaintiffs suffered damages, including the loss of $13,055,221.41.

### COUNT IV – NEGLIGENCE
### (Pursuant to Kansas Law)

172. Plaintiffs incorporate by reference as though fully set forth herein the previous paragraphs of its petition.

173. In compliance with federal banking statutes and regulations, BOKF was required to safeguard financial information by, among other things, implementing a comprehensive information security program that includes administrative, technical, and physical safeguards to ensure the security and integrity of customer information. This program must be designed to protect against anticipated threats or hazards to information security as well as unauthorized access and use of such information that could result in injury to customers.

174. FDIC guidance also dictated that Defendant monitor the internet for fraudulent websites using variations of BOKF's name.

175. The FFIEC recognizes that use of single-factor authentication methods are inadequate against threats of unauthorized access resulting in data theft, customer account fraud, and identity theft. Accordingly, implementation of multi-factor authentication has become an industry standard for financial institutions.

176. A reasonable bank in Defendant BOKF's position would have complied with clear federal regulations and implemented a comprehensive information security program to ensure the security and confidentiality of customer information, protect against anticipated threats and

hazards to the security and integrity of such information and protected against unauthorized access and use of Plaintiffs' competitive, non-public information.

177.    A reasonable bank in Defendant BOKF's position would have implemented multi-factor authentication as is standard in the banking industry.

178.    A reasonable bank in Defendant BOKF's position would have monitored the internet to identify fraudulent websites using variations of Defendant's domain name (i.e., the "@bokff" domain).

179.    A reasonable bank in Defendant BOKF's position would have readily realized that Plaintiff suffered imminent risk of losing $13,055,221.41 when BOKF: (1) failed to implement the comprehensive information security program required by federal law; (2) failed to implement multi-factor authentication when providing access to customer information; (3) repeatedly failed to detect the fraudulent "bokff" website; (4) repeatedly communicated with the spoofed email address, transmitting customer information to this email address on multiple occasions; and (5) provided a criminal with unauthorized access to BOKF's information systems.

180.    A reasonable bank in BOKF's position would have readily realized that Plaintiffs suffered imminent risk of losing $13,055,221.41 when initiating the July 1, 2025 wire transfer because the wire instructions were sent to a spoofed email that multiple indicia of fraud, as set forth above.

181.    BOKF breached its duty to Plaintiffs when Defendant transmitted the wire instructions to the spoofed email address despite multiple indicia of fraud, as set forth above.

182.    Defendant BOKF breached its duty to Plaintiffs when granting a criminal access to the wire instructions and to a portal containing Plaintiff's non-public information, as set forth above.

183.    BOKF breached its duty to Plaintiffs when, after Mr. Steven asked Ms. Fehr to confirm receipt of the July 1, 2025 wire, Defendant failed to immediately notify Plaintiffs that the July 1, 2025 wire.

184.    Defendant's conduct demonstrated negligence, wantonness, callous indifference, and recklessness as evidenced by their disregard for obvious red flags and failure to act on known risks.

185.    As a direct and proximate result, Plaintiff suffered damages, including the loss of $13,055,221.41, as well as consequential damages.

**PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL**

WHEREFORE, Plaintiffs respectively request the Court enter judgment against Defendant BOKF for wanton conduct, constructive fraud, breach of fiduciary duties, and negligence and award damages including, but not limited to: compensatory, consequential, and punitive damages, in an amount to be determined at trial by jury, as well as award Plaintiff its costs herein incurred, and any other relief the Court deems just and proper.

Dated: October 13, 2025

By /s/ Timila S. Rother
Timila S. Rother (Bar No. 14310)
CROWE&DUNLEVY
324 North Robinson Avenue Suite 100
Oklahoma City, OK 73102

Brook B. Andrews, Esq. (*pro hac vice forthcoming*)
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main St., 17th Floor
Columbia, SC 29201

and

Katy Spicer (*pro hac vice forthcoming*)

NELSON MULLINS RILEY &
SCARBOROUGH LLP
101 Constitution Avenue, NW
Suite 900
Washington, D.C., 20001

Attorneys for Plaintiffs